My name is Mark Hayes. I represent Mr. and Mrs. Woods and their company, Black Network Television. Mr. and Mrs. Woods are here with us today. I have three points I'd like to leave the court with today. First, the Cornell case does not impose a certification requirement on standing. Second, that the three cases, Thrombley, Iqbal, and McCleary-Evans, we best understand what that pleading standard is if we look at the facts of those cases. And third, that the complaint is sufficient. Mr. Hayes, if I may, it's driving me crazy in this case. Maybe we can just get it out of the way early on. Maybe I missed something. But can you tell me, please, what in the world is the difference between five liens for $10,000 and two liens for $25,000 each? Assuming payment terms and interest rates and all of that amounts to the same thing. What is this obsession in this case over the number of liens? It doesn't make sense to me. Your Honor, I'm not going to pretend to be an expert in secure transactions and that sort of thing. I understand that as equities shift around, it has to do with kind of how you are in line to get money. But I agree that assuming there's full equity, it doesn't matter. So I haven't missed anything in the record that you're aware of that informs why two liens are different from three liens, given that the loan is fully secured? Right, it's fully secured and there's certainly nothing in the record to that point. I think you'd have to go back to Horn Law on that. Turning to the question of standing. The Carnell case was a case that supported standing. It said that a corporation that was, quote, minority owned and has been properly certified had standing. The court below in this case took that and emphasized it and made the certification an absolute general rule of requirement, which doesn't make sense for three reasons. First, in Carnell, particularly, there was a minority certification program, a preference program, and so that particular fact was relevant in that context. That's not the case here. We just have a general economic development loan. Second, it doesn't make any sense that a program that was designed to help minority firms get federal bids would be used as some sort of procedural bar on 1981 claims that have nothing to do with those sorts of bids. And third, if you look at the underlying cases of Carnell, they don't have any support in them at all for the requirement of certification. Only one of them, Think and Inc., even mentions certification and it uses either or language. A corporation either suffers discrimination harm or has acquired an imputed racial identity. The certification would go to the second of those, but even it doesn't say that you have to have racial identity all by itself. I think one of the cases that Carnell cites, which probably best articulates how this court should approach it is, is Gerstmann says, quote, we might better approach the problem by assuming that if a corporation can suffer harm from discrimination, it has standing to litigate that harm. That's what's happened here. So BNT, Black Network Television, has that standing. Turning to the correct pleading standard, counsel for both sides used a lot of the same cases and I think perhaps we both did a poor job for this court of excising little half sentences of black letter law and then trying to synthesize it into some sort of abstract cohesion. It makes a lot better sense if you look at the facts of those cases to figure out what the correct pleading standard is. And that's this. In the marketplace of life, there are winners and losers. There are people who apply for jobs who get them and those who don't. There are companies who get contracts and those who don't. Distinguishing between that sorting into piles of winners and losers and some particular reason that someone was sorted into the loser pile or some reason that the law has said you can't do that. You can't do that because of discrimination or entwinedly you can't do it under a conspiracy. That distinguishing factor is what makes a pleading sufficient. When you're talking about the sufficiency of the pleading, you kept citing and relying upon Connolly v. Gibson. And you may not like Connolly and Iqbal. There are a lot of people that like it and there are a lot of people that don't. But doggone, it is the law. And when I read a brief that essentially asks us to rule on the basis of Connolly v. Gibson, which didn't require any kind of plausibility standard at all, and then discusses extensively the McDonnell-Douglas proof scheme, which doesn't address the Twombly plausibility standard. It doesn't even kick in until a summary judgment record is set up. It's not done correctly. You're taking a standard here from an earlier day when all you had to do was just submit practically anything in a complaint. There was no requirement of plausibility at all. The brief completely and unmistakably makes clear that you don't like those cases. And all you want to do is go back to Connolly v. Gibson. And that's a framework that was set forth before me in your submission, and I don't think it's right. Your Honor, I think I did a poor job of synthesizing how the new cases took the old cases and expanded and changed them. There's no doubt. There's no question they changed them. But when you look at the text of Twombly itself, it still talks about, and it's not distinguishing this, that the defendant give fair notice of what the claim is and the grounds on which it rests. And then Twombly and Iqbal are talking about how the proving and giving notice of those grounds has changed. And I probably did a poor job of trying to show a cohesive flow of the case history and I don't want to. I don't think you accorded much respect or much respect to the Supreme Court jurisprudence at all. The brief wishes weren't there. Well, in that case, let's look particularly at Iqbal and another case that the city of Greensboro relies on that uses it, McCleary-Evans. So what is the standard? The standard is to use some common sense, some plausibility, to show that there's a distinguishing element between just the way that life sorts out winners and losers. A third lien position is less favorable than a second lien position, whether it's secured or not. A lot of secured creditors don't get paid. And there's a big difference between a loan that's secured and a loan that's guaranteed. And particularly, the security and the collateral for so many loans is a home or a residence. And given the volatility of home prices and everything, even a secured creditor is not guaranteed of anything if the prices of the properties in the neighborhood decline. And anyone will tell you, any creditor, any debtor will tell you, anyone who works in the area of bankruptcy law will tell you that a third lien position is simply more vulnerable than a second lien position. And in terms of the economics of bankruptcy and economics of commercial transactions and of loans, being a third lien position, these are stewards of public funds. Yes, Your Honor. It's not unreasonable to want those public funds in a second lien rather than a third lien posture. Well, absolutely, that is a decision that a fact finder at some point is going to have to make. It wouldn't even have to be a fact finder, wouldn't it? It would be perfectly proper fodder on summary judgment. Right? Perfectly proper. Right. We're here on 12b-6. Right. Right. And so when we get to that question of asking kind of the end of the line or even the middle of the line of summary judgment, whether there's enough security or not, whether that was pretext or not, when we look at the complaint, we're taking all those allegations as true, and we see that there is an allegation that this wasn't just there's a lot of loans and by necessity, by sheer fact of numbers, sometimes good minority firms don't get the loans. There's a lot more than that. They say Greensboro was saying the lien issue was a problem, but there's a lot of allegations that show that it's not. For example? How can this be pretextual? They were willing to grant the loan. They had earlier passed a resolution granting the loan. All they wanted was for the city to occupy no worse than a second lien position, and if that had been guaranteed or if the terms of the loan had been put forward by the requester that they were in a second lien position, the loan would have been granted. It would have been granted no problem. They were willing to. They stated it open for the public record that they were willing to. They even had staff, as I understand it, this is disputed, that tried to facilitate the paperwork associated with getting the loan granted. Well, Your Honor, let's So how does that get to be so pretextual? Well, Your Honor, let's take a look at that record, which is on page 45 of the joint appendix. It talks about the minutes of that meeting and ends with a resolution. It talks about how this is going to be secured. They mess up. We don't know how, but they say the property is going to be securing this loan. They actually give the business address. They don't just mix up the address. The business address is this Eugene Street address. They don't just mix that up. The numbers are mixed up too. Whoever put the numbers in for what the mortgage was and what the lien is does the business address. Those numbers are the value of that property is $1.1 million, $72,000, and that the mortgage debt outstanding is actually $7,000 more than it. So when we're looking at the minutes, we're seeing them offering a second position lien, but not just zero equity, negative $7,000 in equity. So that whole, you know, from the very start we've made this clear. The beginning of this case is equity is not a problem, apparently. You know, they're – Who's there to believe, though, that this was all racially motivated? When an actor proposes a reason – You make the loan should have been granted. Fine. I don't begrudge you that. You're representing someone that wanted to get the loan. So I understand that. But where does this get to be a racially motivated thing? Well, when you have an actor who gives a reason, even if it's got nothing to do with race, if they give a reason and that reason is rebutted, and this is where we get into where I was talking about, you know, on down the line with summary judgment, and that reason is rebutted, that's enough to survive summary judgment. So if we have – But we're not here on summary judgment. And I know we're not. We're on a 12B6. Exactly. And my entire point is if we have factual allegations, even the factual allegations are covering all the bases to lead to those points of evidence that are going to survive summary judgment. If that's going to happen, then how are we getting dismissed on the front end at motion to dismiss? And so the rebuttal of the pretext, you don't have to say, you know, and such and be such was done for racial reasons. And if you did that anyway, it would just be conclusory. And we know that direct evidence and allegations of direct discrimination are really hard to come by. So it's like, you know, flight from the scene of a crime indicates guilt. It's the same sort of thing. You know, municipal budgets are in deep trouble these days. And they are highly stressed because of all the different things that municipal budgets have to fight, schools, fire protection, police forces, municipal workforce. We all know what they are. And they are very, very substantial. And it seems to me that to drive this case further in litigation puts pressure on local governments to be granting loans with public funds on riskier financial terms. And I just wonder if that's the way we want to be driving lending practices. Because it doesn't, this, on the basis of the complaint, this did not seem to me to be a bad actor. And I don't doubt that there are bad actors out there. I don't doubt that there are racially motivated actions out there and everything. But I haven't seen that many complaints where we understand that there was a resolution passed to grant the loan on perfectly fair commercial terms, which is that they wouldn't occupy worse than a second lien position. And the staff actually tries to facilitate the loan and to help the applicant fill out the documents. And it just, this, is this a bad actor as opposed to just a wise creditor? I don't see it. Well, Your Honor, let me. You said that if riskier is a proxy for implicit bias or structural bias or the stereotyped belief on the part of not individual legislators, council members, but the systemic efforts of government to burden certain classes of people, that it's not free of judicial review, is it? Right. Absolutely, Your Honor. And that actually goes right into a point. Of course, we're concerned with what's risky. But we're also concerned under 1981 with how you assess risk. Right. How do you assess risk? And, Your Honor, I think that completely, that maybe makes the link that maybe Judge Wilkinson is looking for to discrimination. It is entirely plausible that an actor who thinks it's a good actor, who thinks I'm going to, you know, make a deal and it'll, you know, further the interests of a minority-owned company and that's great. Isn't it possible that that same actor could have a thought that minority-owned businesses, you know, they're not run as well. Minority-owned businesses, you know, they're not as good of a credit risk. I mean, the lien issue about wanting to tighten that up can be very tightly linked to racial discrimination. I don't doubt that there is this negative stereotyping going on. And I don't doubt that Judge Davis has a point. What troubles me here is that normally, Trombley says you have to get outside of the realm of speculation. And you have to get outside of the realm of mere possibility. And one way you can try to get outside of that is to say, okay, here are the way white-owned businesses are being treated. And here are the way minority businesses are being treated. And there's a difference. That difference is emblematic of discrimination and stereotyping minority businesses as poor creditors, as poor risk for no other reason than their race. That's wrong. That's what 1981 gets at. I get it. I get it, okay? But you have to get comparators. And the one comparator you had was the Kodish loan, where it was a different city council. The decision was made after the loan had been disbursed there. And it was a grant. It was not a loan. It seemed to be, you know, it seemed to be different. I mean, it was in a guaranteed status rather than simply a secured status. And so I just didn't see the comparators. Well, Your Honor, I see my time has expired. I can quickly respond to that if you wish. Certainly. Comparing apples to apples is certainly one way. These two entities are exactly the same except for color. One was treated one way. One was treated the other way. That's certainly a way to show discrimination. My point in bringing up the Reeves case, a case which, by the way, the city of Greensboro didn't just not distinguish. They don't even mention. My point in bringing that up is even down the line at summary judgment, you can have a case where the plaintiff is not saying, this person was just like me and they were treated differently. They can just use the other examples to show that the reason that the actor is giving is false. And that's what these comparators show. I'm not saying they are even apples to apples comparators. I'm just saying that when you have repeated loans that have multiple defaults, third position liens, that sort of thing, it shows that Greensboro isn't really worried about liens and default, which rebutts its protectual reason, which gives rise, even at summary judgment, to enough to survive and go forward to the fact finder. Thank you. Mr. Hayes. Mr. Cain. May it please the court, my name is Patrick Cain. I represent the Appalachian City of Greensboro and the individual council members in their official capacities. With me here today is Deputy City Attorney, Mr. John Roseborough. Judge Davis, as I heard your first initial question to appellant, I was sitting there trying to think of how I was going to respond and explain to you the difference between a second position lien and a third position lien. And I could not do a better job than Judge Wilkinson did in articulating. That's not surprising. It is not surprising at all. And so I would simply adopt what he said in terms of how that is. The problem is on this record under 12B-6, all we have is an allegation, taken as true, that the equity, the remaining equity in the residence was well enough to cover this loan. And we know that's true because it's a 12B-6. And we know that, well, let me ask you, because we don't have the numbers. That's the problem with this case. We don't have any numbers. This case should have been decided on summary judgment. I don't know if the plaintiffs are going to win or not. I have no idea. But when you have an allegation that the equity in the residence is well above any reasonable requirement to collateralize this loan, when you have an allegation like you have here, that these plaintiffs have already invested hundreds of thousands of dollars in this effort. And by the way, this is 2013. We're not talking 2008 at the cusp of the collapse of the residential housing market. These are substantial people. Obviously the city wanted to do it. There's no suggestion here that the city was activated actually by racial animus. They wanted to give them the $300,000. But it's not implausible that cities and states and governments and private entities take a different approach when it comes to minority-owned enterprises, just like they take a different approach when it comes to minority individuals. Even African-Americans discriminate against African-Americans. Women discriminate against women. This is a 1981 claim. You know, you can imagine. I come from Maryland. Prince George's County is the wealthiest African-American majority county in the country. Enormous wealth. Predominant political power in the African-American community. You can imagine. In fact, I'm sure there have been cases where a white-owned business comes to a county like Prince George's County, majority black legislative body, under similar circumstances, whites have a 1981 action as well. This isn't a statute for black people. It's a statute designed to root out race discrimination. So I just don't, honestly, I don't understand. You know, I was a trial judge for many years. And sometimes a defendant gets out over his skis, as they sometimes say these days, and instead of just, you know, laying back, laying in the cut, as we used to say, doing a little discovery and following a proper motion for summary judgment, what's wrong with that? Here, I grant you, this complaint was, you know, it was a mess. I mean, we can see that because the only issue here on appeal is this singular issue. And this is a fine district judge, wonderful district judge. And he had to wade through all of this, and I get all of that. But sometimes, you know, it's best to take a little discovery, do a proper motion for summary judgment, so that you're not coming up to the Fourth Circuit and going back a second time. That's what I think about the difference between five $10,000 liens and two $25,000 liens at the 12B6 stage. And I appreciate Your Honor's position on that. I think that the key in what Your Honor just articulated, though, is that there is no actual allegation of racial animus here. And that gets us into the realm of Iqbal Twombly, Francis Giacomelli in this court, most importantly McCleary Evans, the Maryland Department of Transportation, which says, Your Honor, that if there is an obvious alternative explanation on the face of the complaint that is not racial animus, that it is appropriate to dismiss that case at the 12B6 stage. I think you're reading Cleary too expansively, but I take your point. Okay, and if I am, then I apologize, Your Honor. You don't have to apologize for your argument. But in that case, Your Honor, what was alleged by the plaintiff is that she, as an African-American candidate for a position. I'm familiar with the case. I wrote an opinion when I was on the district court, which, interestingly enough, the Sixth Circuit thought was wonderful. And this court not only didn't think it was wonderful, this court actually went out of its way to reject the reasoning I employed. There's a case against this restaurant chain. Maybe you've heard of it. Dave and Buster's. I have heard of it, Your Honor. Did you come across my opinion in that case? I did not, Your Honor. It was a 1981 case brought by a black family. The gentleman had graduated from the Naval Academy, and his family went to Dave and Buster's in Montgomery County, Maryland, for a celebration after graduation. And the server at the restaurant was so hostile, they ended up getting kicked out of the restaurant. Can you imagine? Just graduated from the Naval Academy, getting kicked out of Dave and Buster's. So I wrote this opinion because the Fourth Circuit law on 1981, how do you actually fashion a cause of action? Because in the retail context, it's really hard to find comparators, right? You walk into Store X as an African-American or of a national or another country, and you get treated terribly, you're not going to have access to the proof of how they treat non-minority customers. It's a transactional kind of thing. And I wrote this opinion that made the argument that, you know, sometimes you have to look at the totality of the circumstance in order to see evidence of potential animus. All right? As I say, the Fourth Circuit rejected that. I thought it was a pretty good opinion. The Sixth Circuit thought it was the greatest thing since sliced bread and adopted the whole reason. And I don't mean to suggest that that applies here. Clearly it doesn't. But it seems to me in this case, this complaint is infused with inferences, available inferences of racial animus, partly because, frankly, it doesn't make any sense at the 12B6 stage of the case to say a third lien somehow changes everything. Same equity. So if the first mortgage had been in the amount of the actual first mortgage and the second lien, you would have granted the loan. It doesn't make any sense. Judge Wilkins is surely right. Of course it makes sense when you get into bankruptcy and you analyze the numbers and what are the payment terms and how old is the lien and what are their payment history and all of that. But you can't do all of that on a 12B6. So if there's hypothetically $500,000 of equity in their home, it seems to me it doesn't matter whether there are two liens, three liens, or four liens at the 12B6 stage. That's not the kind of undermining of plausibility of a racial discrimination claim whether the plaintiff is black suing a majority white city council or the plaintiff is white suing a majority black county council. That's how I see it. And, Your Honor, I think my response to that would be it's neither more plausible or less plausible that it was racially based as opposed to simply an economic decision by the city council, which may or may not have appreciated what Your Honor is saying. But it's not an economic decision if you undermine the economic rationality of it. That's what makes it plausible. Again, there may be perfectly reasonable, logical, compelling, or persuasive explanations. There may be. But simply it's a third lien rather than a second lien makes no sense at the 12B6 stage. It makes no sense. You don't have to have a Ph.D. in economics from Harvard to see that. Would they have gotten a loan if the total outstanding balance of the two liens was actually the balance of the original mortgage? Would they have gotten a loan? Would the city have funded the loan? I'm not sure I follow the perspective. If the total outstanding balance on the two liens, which required the city to take a third position, if that total outstanding balance, instead of being comprised of two separate liens, if it had been the outstanding balance of their original deed of trust note, just one lien but the same amount, would the loan have been funded? Of course it would. Your Honor is correct. Of course it would. So what greater risk was the city taking in terms of the economics of it at the 12B6 stage? I keep saying at the 12B6 stage because I agree with Judge Wilkinson. It really matters whether it's three liens or four liens or five liens, just like their payment history matters, the outstanding amount of their payment history. All of that matters. But on this amended complaint, it doesn't matter. Even under it all in 12B, it doesn't matter. They've alleged enough. I think, Your Honor, that I would refer, Your Honor, to this court's same actor inference that arises in the employment context where you have the same individual both hiring and then terminating. Shortly thereafter. Shortly thereafter. Yeah. And there is a strong inference under, I believe the case is Proud v. Stone, that there is no— A summary judgment decision. Agreed. That's exactly my point. All of that stuff matters in summary judgment. Yes, Your Honor. And I would say that there is a distinct difference in this case that makes it appropriate for the 12B6 analysis. And that is the analogy of the same actor inference would be in this case if the city council had granted or had approved the loan and then shortly thereafter rescinded the loan. That's effectively what they did. That is not what they did. That is effectively what they did. It is not what they did, Your Honor. That is effectively exactly what they did. It is not what they did. Because you just agreed with me that if the outstanding balance, if the burden on the residents was exactly the same, but there was only one lien rather than two, they would have gotten the loan. That's rescinding the loan. It is not rescinding the loan, Your Honor, because the plaintiff still had the opportunity for eight months  And I think that hurts you a lot. That absolutely hurts you a lot. The distinction in this case, Your Honor, and the reason I brought up the same actor inference, is because it is not the same here as hiring and firing, granting the loan, rescinding the loan. There are more facts on the face of the complaint and appropriately in this record that elucidate this point. What happened here, Your Honor, was that the council agreed to enter into a loan under, or they authorized the city to enter into a loan under certain conditions. It then became clear that the lien position, the encumbrances on the property, had been misrepresented. Plaintiff acknowledged that misrepresentation at the second meeting and asked for the city to take a worse lien position. In light of that, it is the equivalent, Your Honor, of in the employment context, an employee being hired, then having determined that there was a misstatement on that employee. The simple question is that the terms for the loan were offered and the terms for the loan were not met. As far as the second and third lien position, notwithstanding the amount of equity that may appear to secure the loan, it's always better in a financial transaction to have only one person in front of you in line than to have two. It's a little bit almost like waiting in line to buy a ticket at a movie theater. You'd rather be at the front of the line than further back, and any creditor would wish that. As far as Buster's is concerned, I'm sure that there are actions taken which we would all deplore, and all I can say is that to try to find racial discrimination out of a complaint like this really diminishes the seriousness of racial discrimination in all of those, unfortunately, too many instances where it has occurred and continues to occur. And you don't want to, in any way, detract from the seriousness of racial discrimination when it is present by trying to see it everywhere. And the complaint here doesn't show a racially motivated actor. It's only speculation. It would be only possibility, and that's not what probably allows. I want to come back to a claim where the... I want to ask about these facts you represent. Is it undisputed that the city supported the project from the beginning? That's undisputed, isn't it? I believe that to be undisputed. That city employees recommended that this business concern apply for the loan, that they help them with the application. The council passed a resolution authorizing the loan, and as the district court noted, the facts show that the city approved the loan in part because B&T was minority-owned. That was seen as a plus factor under the program. That was seen not as a reason to deny the loan, but as a reason to try to facilitate the loan and to make the loan available. And that's just... From the terms of the complaint itself and the record, the undisputed record, they tried to make this happen. They tried to make it happen. They weren't trying to slam the door. I agree with that, Your Honor, and I believe that that is further why this case was appropriately disposed of at the 12v6 stage, because it is not plausible that the same actor who was in part motivated because of the minority status of B&T to authorize the city to enter into this loan in the first instance would then subsequently develop some racial animus that would cause them to not amend the resolution. It's simply not plausible under the facts as pled in this case. It's not plausible in your mind that Harvard would admit a limited number of Jews for much of its history? You think because Harvard admits two or three Jews that there's no religious animus? I mean, let's be blunt. Let's be blunt. Of course, you know better than that. And it is not the case, as a practical matter, as a legal matter, as a matter of common sense to believe at the 12v6 stage, that just because a municipality, often under national and statewide pressure, perhaps, in Greensboro certainly has a unique history that we're all aware of, it's perfectly plausible that this commitment to full participation by minority-owned businesses has certain constraints. I'm not saying that's true here. I'm saying what I've been saying throughout this entire argument. This is a 12v6. I think from what you said, the real animus seems to be they felt lied to, that you used the term misrepresentation, that the applicants actually misrepresented the number of liens, and therefore members of the council perhaps lost confidence in their probity. Fine. Say it. Say it at summary judgment. End of case. Your Honor, I... I did say that. I'm listening to you. I believe it. I'm listening to you, my friend, very closely. All these claims. Conspiracy. Yeah. Given that my time is up and I don't believe there's actually a question pending, I'll simply ask that the court affirm the district court's dismissal of the race discrimination claim in this case. Thank you, Your Honors. Thank you, Mr. King. Mr. Hayes, you have a few minutes reserved as well. Thank you, Your Honor. Real quick. First, to Judge Davis's point, I think you're absolutely right. We should get some numbers and summary judgment, or if the numbers themselves aren't totally clear, you should go to a fact finder. That's where this case should go. Let me respond to the case that T.E. Greensboro said was perhaps the most important in McCleary-Evans, and in doing so, hopefully try to address Judge Wilkinson's, I think, rightful challenge to my poor articulation of the standard of pleading, but I think I can do a better job here. In McCleary-Evans' discrimination case, she was a qualified person. She was a minority. She was a woman. She didn't get the job. What she needed to distinguish was, I mean, I'm sure you all get a lot of applications for clerkships, right? They're fantastic folks, and you must turn down gobs of minorities and people who are totally qualified. That doesn't mean that everybody in that stack has a case. McCleary-Evans didn't distinguish between that natural sorting into winners and losers. She didn't have that little plus, which was this is because of discrimination, other than just add a bunch of conclusory language. That's where the plausibility and the more obvious and the common sense and all of those standards that we've got from Iqbal come into play. In identifying what's the natural sorting of winners and losers, what is that little extra? It can't possibly be that we really are going to dismiss something at 12B6 if there is some more obvious thing you can come up with in common sense. I mean, think about what complaints would look like. You can imagine this looked like, I'll admit, is a mess in part. I wasn't counsel below.  Everything that was more obvious? I mean, that would be crazy. Council for the City of Greensboro at one point talked about, but there are more facts. Well, gosh, that makes my point for me. There are more facts? We're at 12B6 again. Facts are construed my way. They're going to win if facts are insufficient. I don't get to start bringing in other facts and weighing them against me. Judd Wilkinson in the previous case, I wish I could remember exactly what you said, but you said great detail is persuasive. You are absolutely right. Great detail is persuasive. But we're not persuading. We're not persuading the fact finder here. We're here on 12B6. Don't impose that great detail responsibility. I wouldn't dare, but when the Supreme Court does it, I tend to go along. Respect it. The problem is the detail is working against you here. Well, I think only if you take the record as gospel truth. You know, when Greensboro says. . . Aren't we supposed to do that? No. No. You're supposed to construe everything in my favor. So if it says in the minutes. . . But what you said, we were supposed to take what was in there as truth. We are. We are. Let me distinguish. In the minutes, it says, and I see my time has expired, so can I respond to just that question? You certainly may. I always get litigated. And I know the chief would want me. It certainly says in the minutes. You know, Greensboro said this would be a great program because it's a minority-owned business. It's true that it says that. Is it true that that's true? That's the difference. Every detail, if it's in my favor, it's mine. But if it's not, it may not sort its way out in the end. And you shouldn't weigh it against me. I think that's my point. Thank you. Thank you very much.
judges: Roger L. Gregory, J. Harvie Wilkinson III, Andre M. Davis